Antionette Dozier (SBN 244437)
adozier@wclp.org
Jodie Berger (SBN 124144)
jberger@wclp.org
Rebecca Miller (SBN 317405)
rmiller@wclp.org
Richard Rothschild (SBN 67356)
rrothschild@wclp.org
Robert Newman (SBN 86534)
rnewman@wclp.org
**WESTERN CENTER ON LAW & POVERTY**
3701 Wilshire Blvd., Suite 208
Los Angeles, CA 90010
T: (213) 235-2617
F: (213) 487-0242

Lori Rifkin (SBN 244081)
lrifkin@impactfund.org
Fawn Rajbhandari-Korr (SBN 315888)
fkorr@impactfund.org
Meredith Dixon (SBN 346864)
mdixon@impactfund.org
Megan Flynn (SBN 359394)
mflynn@impactfund.org
**IMPACT FUND**
2080 Addison St., Suite 5
Berkeley, CA 94704
T: (510) 845-3473
F: (510) 845-3654
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

KALI RAE PERRONE, ANIKA OKJE ERDMANN-BROWNING and CYNTHIA DE LA MORA, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BROOKE ROLLINS, Secretary, United States Department of Agriculture, in her official capacity; RUSSELL VOUGHT, Director of the United States Office of Management and Budget, in his official capacity.

Defendants.

Case No.: 3:25-cv-09508-AMO

**PLAINTIFFS' NOTICE & EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**

CLASS ACTION

Hearing Date: TBD
Time: TBD

Action filed: November 4, 2025

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................**II**

**EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND OSC RE: PRELIMINARY INJUNCTION** .........................................**1**

**MEMORANDUM OF POINTS AND AUTHORITIES**..............................................**3**

    I.      INTRODUCTION .................................................................3

    II.     BACKGROUND ...................................................................4

          A.     Low-Income Households Rely on SNAP Benefits to Survive. ..4

          B.     Federal Regulations Require States to Administer SNAP
Benefits with Federal Funding Every Month.............................5

          C.     SNAP is a Mandatory Payment Program....................................6

          D.     USDA's Shutdown Directives Disrupted SNAP Benefits
Nationwide. ................................................................................6

          E.     USDA's Failure to Guarantee Full SNAP Benefits Deprives
Plaintiffs and Millions of Households of Food..........................8

          F.     Plaintiffs Tried to Resolve the Issue Without Court
Intervention. .............................................................................10

    III.    ARGUMENT .......................................................................10

          A.     Plaintiffs Satisfy the Standard for a Temporary Restraining
Order. ........................................................................................10

          B.     Plaintiffs are Likely to Succeed on the Merits Because the
SNAP Suspension Directives and November 3 Decision Violate
the Administrative Procedure Act.............................................11

          C.     Plaintiffs and the Proposed Class Will Suffer Irreparable Harm
Without Emergency Relief. ......................................................20

          D.     The Balance of Equities and Public Interest Strongly Favor
Plaintiffs...................................................................................22

          E.     Plaintiffs Satisfy the Legal Standard for a Preliminary
Injunction Under Both the Prohibitory and Mandatory
Injunction Tests........................................................................23

          F.     Plaintiffs Should Not Be Required to Post a Bond. .................23

    IV.    CONCLUSION....................................................................24

i

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES** [Case No. 3:25-cv-09508-AMO]

# TABLE OF AUTHORITIES

**Cases**

*AK Futures LLC v. Boyd Street Distro, LLC*, 35 F. 4th 682, 690-691 (9th Cir. 2022) ................................................................................................................ 16

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ....................... 11

*Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015(D.C. Cir. 2000) ........................ 12

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053(9th Cir. 2014) ....................... 23

*Barahona-Gomez v. Reno*, 167 F.3d 1228(9th Cir. 1999) ...................................... 24

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................. 11, 12

*Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043-44 (D. Haw. 2011) ................. 22

*Consumer Financial Protection Bureau v. Community Financial Serv. Ass'n of America, Ltd.*, 601 U.S. 416 (2024) ............................................................... 15

*Dep't of Commerce v. New York*,  588 U.S. 752 (2019) ........................................ 11

*Disney Enters., Inc. v. VidAngel*, 869 F.3d 848 (9th Cir. 2017) ............................ 11

*Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1184 (9th Cir. 2019) ........................ 12

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ...................................................................................... 23

*Haskins v. Stanton*, 621 F. Supp. 622 (N.D. Ind. 1985) ....................................... 22

*Hernandez v. Sessions*, 872 F.3d 976(9th Cir. 2017) ........................................... 23

*Lambright v. Ryan*, 698 F.3d 808, 817 (9th Cir. 2012) ......................................... 16

*Levesque v. Block*, 723 F.2d 175, 183 (1st Cir. 1983) .......................................... 19

*Maine Community Health Options v. United States*, 590 U.S. 296(2020) ........... passim

*Massachusetts v. United States Dep't of Agric.*, No. 1:25-CV-13165-IT, 2025 WL 3040441 (D. Mass. Oct. 31, 2025) .............................................................. 3, 6

*Newman v. Chater*, 87 F.3d 358, 361 (9th Cir. 1996) ........................................... 15

*Nken v.*

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) ......... 12

*Paxton v. Sec'y of Health and Human Servs.*, 856 F. 3d 1352, 1354 (9th Cir. 1988) .............................................................................................. 22

*Rhode Island State Council of Churches v. Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3050100 (D.R.I. Nov. 1, 2025) .................................................... 3

*S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680 (N.D. Cal. Mar. 1, 2019) .................. 23

ii

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**  [Case No. 3:25-cv-09508-AMO]

*Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 778 (9th Cir. 2006) ............................ 15

*Southside Welfare Rights Org. v. Stangler*, 156 F.R.D. 187, 191 (W.D. Mo. 1993).................... 22

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017)................................................................ 10

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)...................................... 11

*Withrow v. Concannon*, 942 F.2d 1385 (9th Cir. 1991) ............................................................. 23

**Statutes**

17 U.S.C. § 502(a) ....................................................................................................................... 1

2 U.S.C. § 622(9) ....................................................................................................................... 17

2 U.S.C. § 651 ............................................................................................................................ 18

2 U.S.C. § 900(c) ....................................................................................................................... 17

31 U.S.C. § 1512(b)(2) ................................................................................................................ 5

42 U.S.C. § 18062 ..................................................................................................................... 14

5 U.S.C. § 704 ..................................................................................................................... 11, 12

5 U.S.C. § 706(2) ....................................................................................................................... 11

7 C.F.R. § 273.9-10 ...................................................................................................................... 5

7 C.F.R. § 274.1(h) ...................................................................................................................... 5

7 C.F.R. § 274.2 ........................................................................................................................... 5

7 C.F.R. § 274.8 ........................................................................................................................... 6

7 U.S.C. § 2011 .............................................................................................................. 1, 4, 6, 16

7 U.S.C. § 2013 ............................................................................................................... 5, 18, 19

7 U.S.C. § 2014 ................................................................................................................... passim

7 U.S.C. § 2016 ......................................................................................................................... 16

7 U.S.C. § 2020 ................................................................................................................... 5, 16

7 U.S.C. § 2027 ......................................................................................................................... 20

7 U.S.C. § 2257 ....................................................................................................................... 6, 8

7 U.S.C. § 612(c) ......................................................................................................................... 6

Pub. L. No. 118-42, 138 Stat. 25 ................................................................................................. 6

Pub. L. No. 119-4, 139 Stat. 9 ..................................................................................................... 6

Pub. L. No. 95-113, 91 Stat. 913 ............................................................................................... 16

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES** [Case No. 3:25-cv-09508-AMO]

**Rules**

Civil Local Rule 65...................................................................................................... 1

Civil Local Rule 7-10.................................................................................................. 1

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES** [Case No. 3:25-cv-09508-AMO]

**EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND OSC RE: PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that Plaintiffs Kali Rae Perrone, Anika Okje Erdmann-Browning, and Cynthia De La Mora, individually and on behalf of all others similarly situated, move ex parte for a temporary restraining order ("TRO") and an order to show cause ("OSC") re preliminary injunction against Defendants Brooke Rollins, Secretary of the United States Department of Agriculture, and Russell Vought, Director of the United States Office of Management and Budget.  Plaintiffs request that the Court immediately issue the concurrently submitted Proposed Order under Local Rule 7-2 and set a briefing schedule and hearing date for a preliminary injunction.

Plaintiffs request a TRO enjoining Defendants from interfering with Plaintiffs' entitlement to timely receive and redeem SNAP benefits as established by the Food and Nutrition Act, 7 U.S.C. § 2011 *et seq*., for November 2025 and all subsequent months without regard for congressional approval of discretionary funding.

This ex parte application is made pursuant to 17 U.S.C. § 502(a), Federal Rule of Civil Procedure 65, and Local Rules 7-10 and 65.  It is based upon this Notice of Ex Parte Application and Ex Parte Application for Class Certification; the included Memorandum of Points and Authorities; the Declarations of Plaintiffs' counsel Jodie Berger and exhibits thereto, including the Declarations of Plaintiff Kali Rae Perrone, Plaintiff Anika Okje Erdmann-Browning, Plaintiff Cynthia De La Mora, Ruth Freeman, Jarvell Miller, Amanda Mills, Stephanie Stuart, Secretary Kari Armijo, Kasey Reagan, Hilary Hoynes, Hilary Seligman, David Super, Erica Padilla Chavez, Catherine D'Amato, Gabriela Davidson, Shimica Gaskins, Katharine Hanson, Gina Plata-Nino, Ann Sanders, and Peter Zurflieh; all of the records in this action; and any argument that the Court may hold on this application.

Notice of this ex parte application was provided to Defendants.  Plaintiffs' counsel sought to avoid the need for a TRO by issuing demand letters to Defendants Rollins of the USDA and Vought of the OMB on October 28, 2025, requesting assurances that they would maintain normal SNAP operations.  Plaintiffs' counsel met and conferred by phone with counsel for

Defendants on November 4, 2025, during which they discussed Plaintiffs' demand, and provided notice of their intent to file the instant application for temporary restraining order as well as accompanying application for class certification.  As of November 5, Defendants did not indicate that they would ensure the continued operation of SNAP.  Plaintiffs have no alternative but to seek a TRO to prevent irreparable harm.

As detailed in the below Memorandum of Points and Authorities, Plaintiffs and the proposed class are low-income individuals who depend on benefits from the SNAP program to meet their nutritional and subsistence needs.  Despite having a mandatory obligation to fund SNAP benefits, Defendants Rollins and Vought directed a reduction of November benefit allotments and discontinuation of future benefit allotments.

Plaintiffs will suffer irreparable harm without an injunction ordering full continued operation of SNAP benefits for November and all subsequent months.  Any interruption or reduction in benefits will cause hunger and serious financial hardship, which courts in this Circuit have repeatedly recognized are not remedied by retroactive benefits.  A TRO is necessary to preserve the status quo, prevent the unlawful and unnecessary interruption in SNAP benefits, and avoid delays caused by uncertainty within state SNAP agencies as to how to proceed regarding November and subsequent benefit payments.

Dated: November 5, 2025            Respectfully submitted,

_____
Fawn Rajbhandari-Korr
*Attorney for Plaintiffs*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants' refusal to timely and fully fund the Supplemental Nutrition Assistance Program (SNAP) is forcing one in eight people to choose between food and other essentials, like gas, electricity, and medicine.  Parents are skipping meals so their children can eat.

In November 2025, for the first time in the program's 60-year history, the United States Department of Agriculture (USDA) has not distributed full SNAP benefits.  USDA will not distribute further benefits until the current federal government shutdown is resolved.  This refusal is unlawful.  The Food and Nutrition Act and related statutes make SNAP a mandatory entitlement program, requiring that benefits be provided to all eligible households, regardless of the existence of discretionary funding.

On October 24, 2025, USDA declared it would not distribute any November benefits "until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise."[1]  After two federal courts issued emergency relief orders late last week in lawsuits filed by state governments and other groups,[2] USDA agreed on November 3, 2025, to use $4.65 billion dollars in SNAP contingency funds to provide reduced monthly allotments for existing SNAP households, but did not agree to use any funds for new SNAP applicants certified in November 2025.[3]  USDA rejected using other sources of funds to provide full benefits.[4]  As a result, Plaintiffs and tens of millions of low-income families still face food shortages and hunger.

---

[1] Declaration of Jodie Berger in Support of Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Berger Decl.") at Exh. 5 (Oct. 24, 2025 Memorandum). All other declarations cited herein are attached as exhibits to the Berger Declaration.

[2] *R.I. State Council of Churches v. Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3050100 (D.R.I. Nov. 1, 2025); *Massachusetts v. United States Dep't of Agric.*, No. 1:25-CV-13165-IT, 2025 WL 3040441 (D. Mass. Oct. 31, 2025).

[3] Berger Decl. Exh. 9 ¶¶ 3-6 (Supplemental Declaration of Patrick A. Penn, *R.I. Council of Churches v. Rollins*, No. 1:25-cv-00569 (D.R.I. Nov. 3, 2025), ECF No. 21-1)

[4] *Id.* ¶¶ 7-23.

Like 42 million others, Plaintiffs Kali Rae Perrone, Anika Okje Erdmann-Browning, and Cynthia De La Mora rely on their full monthly SNAP benefits to feed themselves and their families.  Any delay or reduction in benefits causes immediate and severe hardship.  Plaintiffs seek emergency relief to stop the unlawful reduction and suspension of SNAP benefits and request a temporary restraining order and preliminary injunction requiring Defendants to immediately restore full monthly payments.

## II.    BACKGROUND
### A.  Low-Income Households Rely on SNAP Benefits to Survive.

SNAP is the nation's most important and effective anti-hunger program.  Congress enacted SNAP to "alleviate . . . hunger and malnutrition" by "permit[ing] low-income households to obtain a more nutritious diet through normal channels of trade[.]"  7 U.S.C. § 2011.  USDA has found that SNAP benefits are critical to relieve food insecurity[5] and decrease the harmful effects of poverty, particularly child poverty.[6]  USDA has also documented the strong correlation between food insecurity and chronic health conditions among low-income working-age adults.[7]  More than half of SNAP recipients are in families with children, and more than one-third of SNAP recipients are in families with older adults or disabled members.[8]  SNAP currently provides over 42 million participants in over 22 million low-income

---

[5] USDA, Food and Nutrition Serv., Office of Policy Support, "Measuring the Effect of Supplemental Nutrition Assistance Program (SNAP) Participation on Food Security," August 2013, pp. 1-2, avail. at https://fns-prod.azureedge.us/sites/default/files/Measuring2013Sum.pdf (last visited Nov. 5, 2025).

[6] USDA, Economic Research Serv., "SNAP Benefits Alleviate the Intensity and Incidence of Poverty," Jun. 5, 2012, at *SNAP's Progressive Benefit Structure Is Well-Suited to Reduce the Intensity of Poverty*, avail. at https://www.ers.usda.gov/amber-waves/2012/june/snap-benefits/ (last visited Nov. 5, 2025).

[7] USDA, Economic Research Serv., Christian A. Gregory and Alisha Coleman-Jensen, "Food Insecurity, Chronic Disease, and Health Among Working-Age Adults," ERR-235, July 31, 2017, p. iv, avail. at https://www.ers.usda.gov/publications/pub-details?pubid=84466 (last visited Nov. 5, 2025) ("Adults in households with lower food security status have elevated probabilities of chronic disease diagnosis for all of the conditions we examine.").

[8] Center on Budget and Policy Priorities, Catlin Nchako, "A Closer Look at Who Benefits from SNAP: State-by-State Fact Sheets," updated January 21, 2025, avail. at https://www.cbpp.org/research/a-closer-look-at-who-benefits-from-snap-state-by-state-fact-sheets#California  (last visited Nov. 5, 2025).

households with food assistance.[9]

SNAP participants are extremely poor.  To be eligible for SNAP, a household's gross income generally must be at or below 130 percent of the poverty line.  7 C.F.R. § 273.9(a)(1).  The maximum net income to be eligible for SNAP is 100% of the federal poverty level.  7 C.F.R. § 273.9(a)(2).  This is currently $1,304 per month for an individual or $2,679 per month for a family of four.[10]  Any delay in receiving SNAP benefits or receipt of an amount less than the full monthly SNAP benefit leaves participants without sufficient money for food, forcing impossible choices between basic nutrition and other essential needs.

**B.  Federal Regulations Require States to Administer SNAP Benefits with Federal Funding Every Month.**

SNAP is a federal-state partnership in which USDA pays the full cost of SNAP benefits, while state SNAP agencies administer the program.  7 U.S.C. §§ 2013(a), 2020.  The issuance and redemption of SNAP benefits is an automated, integrated process involving state SNAP agencies, participants, retailers, and Electronic Benefit Transfer (EBT) processors.  *See* Berger Decl. Exh. 8 ¶ 9 (Declaration of Patrick A. Penn, *Rhode Island Council of Churches v. Rollins*, No. 1:25-cv-00569 (D.R.I. Oct. 31, 2025), ECF No. 14-2).

The Office of Management and Budget (OMB) is responsible for apportioning the funds for USDA to obligate and distribute to state SNAP agencies.  31 U.S.C. § 1512(b)(2).  Each month, states distribute SNAP benefits through EBT cards, enabling participants to purchase groceries at authorized retailers.  7 U.S.C. § 2013.  State SNAP agencies start the next month's benefit process by sending electronic data files to the EBT vendor.  7 C.F.R. § 274.1(h) (state EBT issuance files); *id.* § 274.2 (state agency responsibility for coordination and management of EBT system).  At the end of each day, the state's EBT system totals all EBT transactions and

---

[9] USDA, Supplemental Nutrition Assistance Program, "National and/or State Level Monthly and/or Annual Data, FY 22 through FY 25 National View Summary" (data as of August 8, 2025, for Fiscal Year 2025), avail. at https://fns-prod.azureedge.us/sites/default/files/resource-files/snap-4fymonthly-8.pdf (last visited Nov. 5, 2025).

[10] National Archives, Federal Register, "Annual Update of the HHS Poverty Guidelines," January 17, 2025, avail. at https://www.federalregister.gov/documents/2025/01/17/2025-01377/annual-update-of-the-hhs-poverty-guidelines (last visited Nov. 5, 2025) (dividing annual income by 12).

transfers the cash value of the transactions into the bank accounts of participating retailers. "Concentrator banks" then seek reimbursement for those transactions from U.S. Treasury accounts.  7 C.F.R. § 274.8(c)(1)(iii).

### C.  SNAP is a Mandatory Payment Program.

SNAP is a mandatory payment program established by the Food and Nutrition Act of 2008, which requires the federal government to furnish benefits to all eligible households that apply.  7 U.S.C. § 2014(a).  The mandate to furnish SNAP benefits is not contingent upon a specific source of congressional funding.  Instead, Defendants are statutorily mandated to use any and all previously appropriated funding reserves or other sources of federal funding.

Congress has repeatedly confirmed that SNAP is mandatory program by providing contingency and multi-year funds to ensure uninterrupted benefit payments.  Consistent with that mandate, Congress appropriated a total of $6 billion in Fiscal Years 2024 and 2025 to USDA's contingency reserve to cover necessary expenses under the Food and Nutrition Act of 2008.  7 U.S.C. § 2011 *et seq.*; *see* Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4 § 1101(a), 139 Stat. 9, 10 (2025); *see also* Berger Decl. Exh. 23 ¶ 9 (Declaration of David Super).

As of November 2025, approximately $4.65 billion remains in the contingency reserve, which the courts in *Rhode Island State Council of Churches v. Rollins* and *Commonwealth of Massachusetts v. USDA* ordered USDA to use to fund partial November 2025 SNAP benefit payments.[11]  However, Section 32 funds (7 U.S.C. § 612(c)) and other USDA accounts with multi-year appropriations are available to fully fund SNAP benefits in November and for future months, accessible through USDA's Transfer Authority (7 U.S.C. § 2257).[12]

### D.  USDA's Shutdown Directives Disrupted SNAP Benefits Nationwide.

Before the shutdown began, USDA posted its Fiscal Year 2026 Lapse of Funding Plan,

---

[11] *R.I. State Council of Churches,* 2025 WL 3050100, at *2; *Massachusetts*, 2025 WL 3040441, at *7.

[12] *R.I. State Council of Churches*, 2025 WL 3050100, at *2 (D.R.I. Nov. 1, 2025); *Massachusetts,* 2025 WL 3040441, at *7.

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** [Case No. 3:25-cv-09508-AMO]

dated September 30, 2025, expressly providing for the use of multi-year contingency funds to maintain participant benefits during a lapse of federal appropriations.[13]  Yet, despite the availability of contingency and multi-year funds, Defendants interrupted normal SNAP operations during the government shutdown.

On October 1, 2025, the first day of the shutdown, USDA notified all state SNAP agencies that October benefits would be available, but that USDA's Food and Nutrition Service (FNS) would begin shutting down nonessential operations "[d]ue to a lapse in appropriations." Berger Decl. Exh. 3 (USDA Memorandum).

On October 10, USDA issued a memorandum stating that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation."  Berger Decl. Exh. 4. The memorandum directed states "to hold their November issuance files and delay transmission to State EBT vendors until further notice." *See id.*

On October 24, 2025, USDA issued two directives (the "SNAP Suspension Directives"). The first announced that USDA had suspended SNAP benefits, November's benefits would not be issued, and the SNAP program would remain suspended "until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise."  Berger Decl. Exh. 5.  The second directive reversed USDA's Lapse in Funding plan and asserted that "[c]ontingency funds are not legally available to cover regular benefits."  Berger Decl. Exh. 6.

On November 3, 2025, in response to two federal court orders, USDA announced that it would use all remaining SNAP contingency funds, stated to be $4.65 billion, to issue reduced November 2025 benefits covering about half of eligible households' usual allotments ("November 3 Decision").  *See* Berger Decl. Exh. 9 ¶ 5 (Penn Suppl. Decl.); Exhs. 10-11. However, instead of making 50 percent reductions based on participating households' normal monthly benefit allotments, USDA is instead reducing each household's allotment by a set

---

[13] USDA, "Lapse of Funding Plan (As of September 30, 2025)," p. 15, avail. at https://web.archive.org/web/20251001024645/https://www.usda.gov/sites/default/files/documents/fy2026-usda-lapse-plan.pdf (last visited Nov. 5, 2025) ("These multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year.").

percentage of the maximum monthly allotment, regardless of whether the household was actually receiving the maximum.  Because of the formula for determining actual allotment amounts, where only people with no net income receiving the maximum monthly SNAP allotment, the result is that some households receiving less than the maximum allotment will now receive less than half their regular allotment.  Berger Decl. ¶ 13.  Some will even get no benefits at all for November.  *Id.*  In its November 3 Decision, USDA also determined that it would not draw on Section 32 Child Nutrition Program funds or use its Transfer Authority (7 U.S.C. § 2257) to obligate other funds to fully fund SNAP benefits.  *See* Berger Decl. Exh. 9 ¶ 9 (Penn Suppl. Decl.).

USDA's delay in authorizing use of the contingency funds and refusal to supplement those funds has delayed distribution of even partial benefits for November.  USDA stated that it will notify state SNAP agencies of the required benefit reductions and provide revised issuance tables, but it anticipates significant administrative and technical delays as states reprogram their systems to implement the changes.  Berger Decl. Exh. 9 ¶¶ 24-31(Penn Suppl. Decl.).  Further, once the new data is loaded into the system, additional time is required for actual distribution of funds to SNAP participants.  For example, according to the California Department of Social Services, the data files for CalFresh (California's SNAP program) must be received on or around the 23rd of every month to ensure the timely availability of benefits for the following month.  Berger Decl. Exh. 7 ¶ 21 (Declaration of Ryan Gillette, filed in *Commonwealth of Massachusetts v. United States Department of Agriculture*, No. 1:25-cv-13165 (D. Mass.), Oct. 28, 2025, ECF No. 7-12).

### E.  USDA's Failure to Guarantee Full SNAP Benefits Deprives Plaintiffs and Millions of Households of Food.

Plaintiffs are currently eligible to receive SNAP benefits through the SNAP program. Berger Decl. Exh. 12 ¶ 3 (Perrone Decl.); Exh. 13 ¶ 4 (Erdmann-Browning Decl.); Exh. 14 ¶ 5 (De La Mora Decl.).  Plaintiffs already face ongoing challenges purchasing sufficient food even when receiving their monthly benefits, and these hurdles are significantly exacerbated by reductions in their benefits.  Berger Decl. Exh. 12 ¶¶ 7-10; Exh. 13 ¶¶ 20-23; Exh. 14 ¶¶ 8-11.

Ms. Perrone, her husband, and their three children (ages 8 months, 11 years, and 16 years) receive $1,100 in SNAP benefits each month.  Berger Decl. Exh. 12 ¶¶ 2-3.  In a 31-day month, Ms. Perrone and her family in total have $35.48 to spend on food per day and $11.82 to spend per meal.  *See Id.*  Other than SNAP and WIC, her family has no money for food.  *Id.* ¶¶ 6-8.  She stretches her budget to save money every month and still does not have enough income to pay her rent.  *Id.* ¶¶ 8-9.  She fears that any delays in SNAP benefits each month will force them to rely solely on their limited emergency supply of canned goods, which will not last very long for a family of five.  *Id.* ¶ 10.

Ms. Erdmann-Browning and her husband live in a trailer in an RV park.  Berger Decl. Exh. 13 ¶¶ 10-11.  Plaintiff Erdmann-Browning has multiple sclerosis and her husband is her caretaker.  *Id.* at ¶¶ 5, 9.  She receives $24 per month in SNAP benefits.  *Id.* ¶ 4.  She spends her cash income on basic needs such as medication, rental fees for her trailer, propane and electricity, gas, hygiene and laundry supplies, and food and vet bills for her service dogs.  *Id.* ¶¶ 12-19.  Whatever is left, she spends on food.  *Id.* ¶ 20.  Ms. Erdmann-Browning has a medical condition that requires her to take her medication with food, so if she has to skip a meal, it affects her ability to take her medication.  *Id.* ¶ 18.  She drinks glasses of water to feel full when she is hungry.  *Id.* ¶ 22.

Ms. De La Mora is a single parent of five children (2 teenagers, a 5 year-old, and 3 year-old twins), two with disabilities.  Berger Decl. Exh. 14 ¶ 3 (De La Mora Decl.).  She receives $860 per month in SNAP benefits for her family.  *Id.* ¶ 5.  In a 31-day month, Ms. De La Mora has $9.25 total using SNAP to spend per meal per day for this family of six.  *Id.* Ms. De La Mora's monthly expenses exceed her income, and she is drowning in debt to keep the electricity on in her home.  *Id.* at ¶¶ 6-8.  Ms. De La Mora sacrifices her own meals so her children can eat, often getting by on only one meal per day.  *Id.* at ¶ 10.  When food supplies dwindle, her family goes without necessary medication.  *Id.* at ¶ 11.  A delay in SNAP or not receiving the full amount would cause severe hardship to Ms. De La Mora and her family.  *Id.* at ¶ 7.

The current delay and reduction in SNAP benefits is already having and will continue to have severe consequences for Plaintiffs and for the millions of households who depend on these

benefits to meet their basic nutritional needs. Berger Decl. Exh. 17 ¶¶ 11-12 (Declaration of Amanda Mills); Exh. 18 ¶¶ 6-7 (Declaration of Stephanie Stuart); Exh. 25 ¶¶ 7-9 (Declaration of Catherine D'Amato); Exh. 29 ¶ 10 (Declaration of Gina Plata-Nino); Exh. 30 ¶¶ 5-7 (Declaration of Ann Sanders). Even a short interruption leaves families unable to purchase groceries, forcing them to skip meals, rely on food pantries already stretched beyond capacity, or go hungry. Berger Decl. Exh. 22 ¶ 2 (Declaration of Hilary Seligman); Exh. 24 ¶ 11 (Declaration of Erica Padilla Chavez); Exh. 26 ¶¶ 6-7 (Declaration of Gabriela Davidson). For many recipients, SNAP benefits represent their only consistent source of food support, and any delay or reduction threatens their health, stability, and dignity. Berger Decl. Exh. 12 ¶ 10 (Perrone Decl.); Exh. 13 ¶ 22 (Erdmann-Browning Decl.); Exh. 14 ¶ 12 (De La Mora Decl.); Exh. 17 ¶¶ 11-12 (Mills Decl.); Exh. 22 ¶¶ 16-18 (Seligman Decl.).

### F. Plaintiffs Tried to Resolve the Issue Without Court Intervention.

Plaintiffs' counsel sought to avoid the need for emergency court intervention. After learning of USDA's SNAP Suspension Orders on October 24, counsel sent a letter on October 28 to Defendants Rollins and Vought. Berger Decl. ¶ 2, Ex. 1. The letter requested that OMB apportion federal funds to support the issuance of November 2025 and ongoing SNAP benefits for eligible households, and that USDA to inform state SNAP agencies that funds are available for distribution and requested a response by November 3. *Id.* Counsel have made extensive efforts to ensure that their letter was delivered to the appropriate parties. Berger Decl. ¶¶ 2-3, Ex. 1. On November 3, 2025, Plaintiffs' counsel spoke with Pamela Johann, Civil Chief at the U.S. Attorney's Office for the Northern District of California, to advise her of the forthcoming lawsuit and e-mailed her a copy of the demand letter. Because Defendants did not indicate their willingness to ensure the continued operation of SNAP, Plaintiffs are compelled to file this lawsuit and to seek an injunction preventing irreparable harm to SNAP participants nationwide.

## III.    ARGUMENT

### A. Plaintiffs Satisfy the Standard for a Temporary Restraining Order.

The temporary restraining order standard is "substantially identical" to the preliminary injunction standard. *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). Plaintiffs

must show that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Disney Enters., Inc. v. VidAngel*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction," so long as the second and fourth *Winter* factors are also satisfied. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### B. Plaintiffs are Likely to Succeed on the Merits Because the SNAP Suspension Directives and November 3 Decision Violate the Administrative Procedure Act.

The Administrative Procedure Act ("APA") requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2); *Dep't of Commerce v. New York*, 588 U.S. 752, 771 (2019). The Act further empowers this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As set forth below, Plaintiffs are likely to succeed on their APA claim because the Food and Nutrition Act requires USDA to provide full SNAP benefits to every eligible household that has applied. 7 U.S.C. § 2014(a). Despite this statutory obligation, USDA has halted full SNAP benefit payments, first declaring that SNAP benefits would cease during the government shutdown, and now authorizing only delayed and partial November SNAP benefits with no further benefits during the shutdown. These actions should be set aside because they directly contradict the plain statutory language.

### i. The SNAP Suspension Directives and November 3 Decision are final agency actions.

The APA provides for judicial review of "final agency action" under 5 U.S.C. § 704 when the actions are the culmination of the agency's decision-making process and impose immediate legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). USDA's SNAP

Suspension Directives and November 3 Agency Decision are final agency actions subject to judicial review.

An agency action is final for the purposes of Section 704 review if it meets two conditions. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). First, the action must "mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature." *Id*. Second, the action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. Courts applying this test "focus on the practical and legal effects of the agency action and interpret finality in a pragmatic and flexible manner." *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1184 (9th Cir. 2019) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv*., 465 F.3d 977, 982 (9th Cir. 2006)) (internal quotation marks omitted).

Both *Bennett* conditions are satisfied here. In evaluating *Bennett's* first condition, courts consider "whether the action amounts to a definitive statement of the agency's position" and whether the agency expects "immediate compliance" with its terms. *Or. Nat. Desert Ass'n*, 465 F.3d at 982. The SNAP Suspension Directives are a definitive statement of USDA's position on the continuation of SNAP during a lapse in appropriations: there is a direct and immediate suspension of SNAP benefits. *See* Berger Decl. Exh. 6 ("Impact of the Government Lapse on November Supplemental Nutrition Assistance Program (SNAP) Household Benefits"). The November 3 Decision is an additional definitive statement from USDA that it will, per court orders, authorize use of the contingency fund to "cover 50% of eligible households' current allotment," but it will not draw on Section 32 Child Nutrition Program funds or other funds to fully fund SNAP benefits in November or in the future while the shutdown is ongoing. Berger Decl. Exh. 9 ¶¶ 8-9 (Penn Suppl. Decl.). USDA expects states to comply immediately, issued further guidance with instructions on November 4, 2025, leaving little time to prevent the resulting harm. *See* Berger Decl. Exhs. 10-11.

The SNAP Suspension Directives had immediate and concrete legal consequences, causing states to suspend November benefit issuance. *See Appalachian Power Co. v. E.P.A*., 208 F.3d 1015, 1023 (D.C. Cir. 2000) (*Bennett's* second condition is satisfied where a guidance

document "give[s] the States their 'marching orders'"). Similarly, the November 3 Agency Decision requires states to "rely on the issuance tables to calculate the benefits due to each eligible household" and "recode their eligibility systems to adjust for the reduced maximum allotments." Berger Decl. Exh. 9 ¶¶ 26-27 (Penn Suppl. Decl.). This decision denies Plaintiffs and class members half or more of their November SNAP benefits and any future benefits during the government shutdown. Because both *Bennett* conditions are met, the SNAP Suspension Directives and November 3 Decision are final agency actions.

### ii. The agency actions are contrary to law because Defendants' obligation to pay full monthly SNAP benefits is not conditioned on an appropriation.

Plaintiffs are likely to succeed on their claim that, because SNAP is a mandatory payment program, Defendants must continue funding and issuing full SNAP benefits for November 2025 and subsequent months. The Food and Nutrition Act mandates that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a). This statutory provision imposes a clear duty on USDA to provide SNAP benefits regardless of whether Congress has separately appropriated funds. As discussed below, the Supreme Court has described similar statutory language as "obligation-creating language" that requires government payment, even without direction as to the manner in which the obligation is to be satisfied. *Maine Community Health Options v. United States*, 590 U.S. 296, 312 (2020).

In *Rhode Island State Council of Churches v. Rollins*, the court found that SNAP is a statutory entitlement under 7 U.S.C. § 2014(a), requiring assistance to all eligible households. No. 25-cv-569-JJM-AEM, 2025 WL 3050100 at *2 (D.R.I. Nov. 1, 2025). The court ordered USDA to use contingency funds to ensure payment of benefits and acknowledged that the agency has discretion to draw on other sources to cover either the full or partial cost of November SNAP benefits. *Id.* USDA considered, but ultimately rejected, obligating funds from Section 32 Child Nutrition Programs to pay the full amount of benefits and other funds pursuant to its Transfer Authority. Berger Decl. Exh. 9 ¶ 9 (Penn Suppl. Decl.). While the *Rhode Island* ruling partly addressed the immediate issue of maintaining SNAP operations during the lapse in

appropriations, it did not resolve the legal question presented here: whether USDA may lawfully withhold or reduce benefits that Congress made mandatory under the Food and Nutrition Act.

### (a) The Supreme Court has affirmed that Congress can create an enforceable government payment obligation unconditioned on any specific appropriation.

In *Maine Community Health Options*, the Supreme Court considered whether specific language from the Affordable Care Act created an enforceable government obligation despite lacking any formal appropriation or direction on how the obligation would be paid.  Section 1342, C. of the Act, 42 U.S.C. § 18062, required the government to compensate insurers participating in the "Risk Corridors" program, which was created to encourage insurers to enter online insurance marketplaces by defraying their costs and limiting their risk.  *Maine Community Health Options*, 590 U.S. at 300.  Section 1342 provided in pertinent part that "the Secretary shall pay" participating plans with financial losses that exceeded a certain predicted threshold.  *Id.*  As the Court noted, "When it enacted the Affordable Care Act in 2010, Congress did not simultaneously appropriate funds for the yearly payments the Secretary could potentially owe under the Risk Corridors program.  Neither did Congress limit the amounts that the Government might pay under § 1342."  *Id.* at 302-03.

The lack of appropriation did not prevent the Court from enforcing the government's mandatory legal obligation.  Starting from the premise that "[t]he Government may incur an obligation by contract or by statute," *id.* at 308, the Court acknowledged that government obligations are "typically" created by the passage of a statute *and* appropriated funds separately enacted by Congress.  *Id.*  "But," it continued, "Congress can deviate from this pattern."  *Id.*  "Congress can also create an obligation directly by statute, without also providing details about how it must be satisfied."  *Id.* at 309.  The Court determined that the language of section 1342 created such a legal obligation.  *Id*. at 309-10. "The first sign that the statute imposed an obligation is its mandatory language: 'shall.'  'Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement.'"  *Id.* at 310.  In addition, adjacent provisions differentiated between when the Secretary of Health and Human Services "shall" act and when she "may" exercise discretion, demonstrating that Congress specifically chose mandatory terms

for section 1342.  *Id.*

The government argued in *Maine* that the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the Antideficiency Act, 31 U.S.C. § 1341, made appropriated funds a necessary prerequisite to any payments.  *Maine Community Health Options*, 590 U.S. at 311.  The Court rejected these arguments, concluding that both the Constitution and the Antideficiency Act limit financial commitments by federal employees, not by Congress itself.  *Id.* at 312.  Ultimately, the Court held that:

> [Section] 1342's obligation-creating language does not turn on whether Congress expressly provided "budget authority" before appropriating funds. . . .  Congress usually gives budget authority through an appropriations Act or by expressly granting an agency authority to contract for the Government.  But budget authority is not necessary for Congress itself to create an obligation by statute.

*Id.* Thus, Congress can create mandatory obligations for the federal government, even without an associated appropriation to fund the obligation.  *Id.*; *see also Consumer Financial Protection Bureau v. Community Financial Serv. Ass'n of America, Ltd.*, 601 U.S. 416 (2024).

### (b)  The Food and Nutrition Act uses obligation-creating language for the issuance of monthly SNAP benefits.

Like the Affordable Care Act, the Food and Nutrition Act uses obligation-creating language to direct the issuance of critical food assistance benefits to low-income households across the country.  Section 2014 of the Food and Nutrition Act provides: "Assistance under this program *shall be furnished* to all eligible households who make application for such participation." 7 U.S.C. § 2014(a) (emphasis added).[14]  *See also Maine Community Health Options*, 590 U.S. at 310-11 (explaining Congress's use of the word "shall" usually connotes a requirement); *accord Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 778 (9th Cir. 2006) ("Congress's or an agency's use of the word 'shall' indicates a mandatory duty that is not subject to discretion.").  While the courts "will depart from the interpretation of 'shall' as mandatory where a convincing argument to the contrary is made, . . . such occasions are rare." *Id.* (citing *Newman v. Chater*, 87 F.3d 358, 361 (9th Cir. 1996)).  There is no evidence that this is one of those rare occasions.

---

[14] Unless otherwise stated, italics within a citation will indicate that emphasis has been added.

In addition to the word "shall," Section 2014(a) of the Food and Nutrition Act also uses the word "all," specifying that assistance shall be provided to "all" eligible households. "The use of 'all' indicates a sweeping statutory reach." *AK Futures LLC v. Boyd Street Distro, LLC*, 35 F. 4th 682, 690-691 (9th Cir. 2022) (construing a provision of the Farm Act); *see also Lambright v. Ryan*, 698 F.3d 808, 817 (9th Cir. 2012) ("The common meaning of the word 'all' is 'the whole amount, quantity, or extent of; as much as possible[.]'").

The surrounding provisions of the Food and Nutrition Act also use mandatory language to ensure uniform and reliable provision of SNAP benefits and are also not conditioned on annual appropriations. The "Congressional declaration of policy" provides: "To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized *which will permit* low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. A subsequent section specifies that "the Secretary *shall* establish uniform national standards of eligibility." *Id.* at § 2014(b). The "State agency *shall* promptly restore any improperly denied benefits . . . and *shall* take other steps to prevent a recurrence of such errors[.]" *Id.* at § 2020(b). And "the specific standards to be used in determining the eligibility of applicant households which *shall* be in accordance with sections 2014 and 2015 of this title and *shall* include no additional requirements imposed by the State agency[.]" *Id.* at § 2020(e)(5).

In general, SNAP applications "shall" be processed, and benefits issued to those eligible, no later than 30 days after the date of application. *Id.* § 2020(e)(3); *see also* 7 C.F.R. § 273.2(a), (g)(1) and (g)(3). States "shall . . . ensure that no household experiences an interval between issuances of more than 40 days" if staggering issuance dates throughout the month. 7 U.S.C. § 2016(g)(2)(ii). Having received complaints that the earlier Food Stamp Program was not responding quickly enough to requests from persons in immediate need, Congress introduced the concept of "expedited service" benefits in the Food and Agriculture Act of 1977. Pub. L. No. 95-113, § 1301, 91 Stat. 913, 958-72 (1977). Federal law currently requires that benefits "shall" be issued within seven days of the date of application to households in immediate need. 7 U.S.C.

§ 2020(e)(9); *see also* 7 C.F.R. § § 273.2(a)(2), (i)(l).

The use of mandatory language throughout the Food and Nutrition Act to describe the entitlement of participants to SNAP benefits is even stronger in this case than it was in *Maine Community Health Options*. There, Congress not only failed to appropriate money for the Risk Corridors program, but two successive lump sum appropriations included riders specifying that "[n]one of the funds made available by this Act . . . may be used for payments . . . relating to risk corridors." *Maine Community Health Options*, 590 U.S. at 304. Nonetheless, the Supreme Court discounted the riders, concluding that "Congress merely appropriated a less amount than that required to satisfy the Government's obligation, without expressly or by clear implication modif[ying] it." *Id.* at 316. Other funds could be used to satisfy the government's obligation. *Id.* Here, Congress has never expressed any intent to deny or delay funding to SNAP, much less to modify the funding obligation. Indeed, as discussed below, Congress has elsewhere categorized SNAP funding as a mandatory government obligation that exists with or without an annual appropriation.

### (c)  Budget legislation categorizes SNAP as a mandatory obligation.

In addition to the above statutory provisions in the Food and Nutrition Act, at least two congressional budget laws explicitly define or categorize SNAP as an obligation of the United States government or an entitlement that exists independent of appropriated funds. First, a statutory provision governing congressional budget procedure expressly includes the food stamp program (as SNAP was formerly known) within the definition of "entitlement authority," along with authority to make payments outside of appropriated funds. 2 U.S.C. § 622(9). The statute provides:

> (9) The term "entitlement authority" means—
> (A) the authority to make payments . . . , the budget authority for which is not provided for in advance by appropriation Acts, . . . if, under the provisions of the law containing that authority, the United States is obligated to make such payments to persons or governments who meet the requirements established by that law; and
> (B) the food stamp program.

Second, Congress explicitly named SNAP in its definition of "direct spending," which is spending authorized without appropriated funds. 2 U.S.C. § 900(c)(8). The statute provides:

> (8) The term "direct spending" means
>     (A) budget authority provided by law other than appropriation Acts;
>     (B) entitlement authority; and
>     (C) the Supplemental Nutrition Assistance Program.

*Id.* Rather than being limited by an appropriation, SNAP's entitlement status places it under the provisions of the Congressional Budget Act (2 U.S.C. § 651), which governs "[b]udget-related legislation not subject to appropriations." USDA's spending is controlled through the budget reconciliation process of the Congressional Budget Act, 2 U.S.C. § 641(a)(1)(C).

The mandatory nature of the government's obligation under SNAP is also documented in USDA's most recent Lapse in Funding Plan, dated September 30, 2025. The plan states:

> Congressional intent is evident that SNAP's operations should continue since the program has been provided with multi-year contingency funds that can be used for State Administrative Expenses to ensure that the State can also continue operations during a Federal Government shutdown. These multi-year contingency funds are also available to fund participant benefits in the event that a lapse occurs in the middle of the fiscal year.

Berger Decl. Exh. 2 at 15. Furthermore, USDA has historically indicated the intent to use contingency funds, or has in fact used other funding, to provide for continued benefits to eligible SNAP recipients. *Id.* at 15-17.

Thus, the statutory language, surrounding legislative provisions, and treatment of the program in congressional budget legislation and program operations demonstrate that SNAP benefits are an obligation of the federal government independent of annual appropriations.

### (d) Congress used conditional language in other sections of the Food and Nutrition Act depending on appropriations.

In determining that the statute at issue in *Maine Community Health Options* created a funding obligation, the Supreme Court observed that language in surrounding provisions used permissive "may" language, instead of mandatory "shall" language. 590 U.S. at 310-11. Similarly, Congress used language conditioned on appropriations in some sections of the Food and Nutrition Act when it did not intend to create an obligation. For example, Congress used language conditioned on appropriations in the provision establishing SNAP. Section 2013(a)(1), "Establishment of supplemental nutrition assistance program," states:

> **Program – Establishment.** Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer a supplemental nutrition assistance program under which . . . eligible households . . . shall

be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment[.]

7 U.S.C. § 2013(a)(1). This section imposes fiscal constraints on program creation and administration. The provision to "formulate and administer" the program is necessary because "[t]he Food Stamp Program has never been self-executing." *Levesque v. Block*, 723 F.2d 175, 183 (1st Cir. 1983), and the program required further agency actions to take effect. The accompanying section 2013(c) again refers to program administration, directing the Secretary to issue regulations "consistent with this chapter" "for the effective and efficient administration of the supplemental nutrition assistance program." 7 U.S.C. § 2013(c). Thus, the structure of section 2013 demonstrates that its purpose is to impose fiscal limits on program administration, not individual benefits.

Canons of statutory interpretation dictate that each word and clause of a statute must be given operative effect, if possible, and read to avoid an interpretation that would render a word or a part of a statute inoperative or redundant. *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019); *see also Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 161 (2018) (noting that when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning). While section 2013(a) requires appropriations "to formulate and administer" SNAP, section 2014 requires issuance of benefits to all qualifying households without reference to appropriations. 7 U.S.C. §§ 2013(a), 2014. The only way to give each section full operative effect is to read section 2013 as requiring appropriations for program development and administration *only*, while section 2014 and other sections cited above create a legal duty for USDA to ensure regular issuance of SNAP benefits to qualifying households.

The use of mandatory language in section 2014(a) signifies that funding for SNAP benefits is not dependent on an annual appropriation.

### (e) The Food and Nutrition Act's provision on "appropriations and allotments" does not permit USDA to suspend SNAP benefits during a government shutdown.

The Food and Nutrition Act does identify the conditions under which the Secretary of Agriculture may reduce SNAP benefits and the manner in which such reductions may occur. 7

19

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES** [Case No. 3:25-cv-09508-AMO]

U.S.C. § § 2027(b), (c).  While the Act provides for a benefit reduction when the total value of benefit allotments will exceed the appropriation for the fiscal year, *id.* at § 2027(b), neither section 2027 nor any other provision of the Act allows USDA to shut SNAP down altogether when Congress fails to pass an appropriation.

To the contrary, the Act's legislative history demonstrates that Congress implemented section 2027 to prevent the sudden interruption of SNAP benefits when appropriated funds ran out. The House Agriculture Committee, which proposed the amendment to section 2027's spending limits, declared that it would no longer accept:

> the unfortunate situation of the past few years where . . . the continuation of full food stamp benefits has been uncertain [and r]ecipients nationwide have been threatened with delays and reductions pending Congressional approval of supplemental appropriations legislation late in the fiscal year. This has led to confusion and unnecessary fear at the local level, as well as additional administrative cost and burden.

H.R. Rep. No. 99-271, 166, *reprinted in* 1985 U.S. Code Cong. & Admin. News 1270. The Committee declared that benefit reductions should result only from "an explicit decision to do so," not the mere failure to pass legislation. *Id*. (stating that the secretary was permitted "to reduce benefits across-the-board only if the authorization level, rather than the amount appropriated by congress, appears to be insufficient").

In short, Congress has demonstrated, both in the Food and Nutrition Act and in statutes governing budget procedure, that SNAP benefits must be reliable and continue under all circumstances, even in the rare absence of an annual appropriation.  Any reduction due to insufficient appropriations must follow the specific provisions of section 2027, which does not apply in the present situation.  In sum, Defendants' failure to comply with their statutory obligations violates the Administrative Procedure Act, and Plaintiffs are likely to prevail on the merits of their claims.

### C.    Plaintiffs and the Proposed Class Will Suffer Irreparable Harm Without Emergency Relief.

Plaintiffs and proposed class members will continue to suffer irreparable harm unless this Court grants a temporary restraining order requiring Defendants to fulfill their statutory obligation to continue the full issuance of SNAP benefits during any government shutdown.

Any delay or reduction in SNAP benefits will cause millions to go hungry, as food banks are already stretched to capacity and struggling to meet the tremendous increase in demand. *See* Berger Decl. Exh. 29 ¶ 12 (Plata-Nino Decl.); Exh. 18 ¶ 7 (Stuart Decl.). Food banks will not be able to meet the extraordinary need caused by a nationwide interruption in SNAP benefits. *See* Berger Decl. Exh. 27 ¶¶ 13-14 (Gaskins Decl.), ("Disrupting [SNAP] benefits would cause immense harm to the households who rely on the program to eat," and "overwhelm our partner food assistance agencies."). Nor can food banks meet all the same needs as SNAP. For example, many food banks do not provide infant formula or accommodate food allergies, which are possible with SNAP benefits. Berger Decl. Exh. 26 ¶ 6 (Davidson Decl.).

Food insecurity has been connected with an array of negative outcomes, including poor health among children, lower academic achievement, and depression.[15] In the opinion of one nationwide expert on food security programs, "delays in providing SNAP benefits cause low-income households either to suffer or be at risk of suffering hardships," including going hungry, paying for food at the expense of other necessities of life, or, alternatively, paying for other necessities of life at the expense of having enough to eat. Berger Decl. Exh. 22 ¶ 2 (Seligman Decl.); *see also id.* Exh. 21 ¶¶ 3, 15-24 (Hoynes Decl.). Delays in providing SNAP benefits will leave children unable to go to school or reduce their participation and performance at school because they are ill or weak from hunger. Berger Decl. Exh. 21 ¶¶ 22-24 (Hoynes Decl.). To make matters worse, lack of access to SNAP during childhood—even for a short period—can negatively impact a child's health, even years later and into adulthood, as well as causing other indirect health outcomes. *Id.*

Multiple courts have recognized the severe irreparable harm from disruption in food assistance. "[U]nless a preliminary injunction issues to prevent delays and interruptions in food stamp benefits, the plaintiffs may be deprived of food. The deprivation of this basic human need is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon

---

[15] Caroline Ratcliffe, Signe-Mary McKernan, and Sisi Zhang, *"How Much Does the Supplemental Nutrition Assistance Program Reduce Food Insecurity?,"* AMERICAN JOURNAL OF AGRICULTURAL ECONOMICS (July 12, 2011),

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4154696/ (last visited October 27, 2025).

recipients." *Haskins v. Stanton*, 621 F. Supp. 622, 627 (N.D. Ind. 1985) (citation omitted); *accord*, *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043-44 (D. Haw. 2011).  The harms extend beyond hunger:

> The human suffering, emotional trauma and physical injury that will result from an inability to get food by this country's most needy is too obvious to need further space in this decision. Irreparable injury is clearly present, and there are no other adequate remedies at law[.]

*Southside Welfare Rights Org. v. Stangler*, 156 F.R.D. 187, 191 (W.D. Mo. 1993) (granting preliminary injunction to enforce the timely issuance of expedited food stamps).

Retroactive payments will not resolve the daily hunger or the failure to meet other basic needs suffered by millions of families dependent on SNAP benefits.  *See Paxton v. Sec'y of Health and Human Servs.*, 856 F. 3d 1352, 1354 (9th Cir. 1988) (for families living at subsistence level, the loss of any benefit can jeopardize their ability to survive)).  Because food is a basic necessity, many recipients must sacrifice other essentials—rent, utilities, or transportation—to eat.  *See, e.g.*, Berger Decl. Exh. 12 ¶ 8 (Perrone Decl.); Exh.17 ¶ 13 (Mills Decl.); Exh. 18 ¶ 8 (Stuart Decl.); Exh. 22 ¶ 2 (Seligman Decl.).  Funds issued weeks or months later can only be used for food, not to cover overdue bills.  For example, Ms. Perrone restricts her driving to save cash and does not heat her home with propane.  Berger Decl. Exh. 12 ¶ 9 (Perrone Decl.).  She does not have a back-up plan to survive if her family does not have enough food because SNAP is her safety net.  *Id.* ¶ 10.  Similarly, Ms. Stuart stopped driving and paying for car insurance to so she could purchase food.  Berger Decl. Exh. 18 ¶ 8 (Stuart Decl.)  Missing SNAP benefits inflict immediate and compounding harm that no retroactive payment can undo because the loss of food today cannot be restored tomorrow.

**D.  The Balance of Equities and Public Interest Strongly Favor Plaintiffs.**

The balance of equities and public interest heavily favor Plaintiffs.  *See Nken v. Holder*, 556 U.S. 418, 435-36 (2009) (courts consider these factors jointly when plaintiffs seek emergency relief against the government).  Plaintiffs face the imminent risk of hunger and other irreparable harm if their SNAP benefits are lost or interrupted.  Defendants, by contrast, will suffer no cognizable harm from an order requiring them to comply with their statutory duties.  A

temporary restraining order directing agencies to follow the Food and Nutrition Act cannot be considered a burden because "[t]he Act itself imposes the burden; th[e] injunction merely seeks to prevent the defendants from shirking their responsibilities under it." *Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991). Any claimed hardship to Defendants is minimal compared to the magnitude of the "preventable human suffering" that will occur if the Court allows the SNAP Suspension Orders to remain in effect. *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (internal quotation marks and citation omitted).

### E. Plaintiffs Satisfy the Legal Standard for a Preliminary Injunction Under Both the Prohibitory and Mandatory Injunction Tests.

An injunction may be either mandatory or prohibitory, depending on whether the plaintiff is seeking to change or maintain the status quo. Here, Plaintiffs are seeking a prohibitory injunction because they are asking the Court to maintain the status quo, which is continued issuance of SNAP benefits to eligible participants without interruption, consistent with Defendants' legal obligation. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) ( "status quo" refers to "the legally relevant relationship between the parties before the controversy arose"); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *13 (N.D. Cal. Mar. 1, 2019) (granting prohibitory injunction ordering Department of Homeland Security (DHS) to continue processing 2,714 applications for parole after the program's termination, reasoning that the last uncontested status was when DHS continued processing applications as usual).

However, even if the Court deems the requested injunction mandatory, Plaintiffs meet that standard. *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when extreme or very serious damage will result that is not capable of compensation in damages, and the merits of the case are not doubtful."). Tens of millions of people will not be able to adequately feed their families without sacrificing other basic necessities, and retroactive lump-sum benefits cannot make up for the diversion of limited income from rent, utilities, or medication.

### F.    Plaintiffs Should Not Be Required to Post a Bond.

23

**PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** [Case No. 3:25-cv-09508-AMO]

The court has discretion to waive the bond requirement for low-income people. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). As SNAP recipients, Plaintiffs have extremely limited income and resources. The Court may also waive the bond requirement where an injunction poses minimal likelihood of harm to a defendant. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). The Court should do so here.

## IV.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order without requiring posting of a bond.

Dated: November 5, 2025                    Respectfully submitted:

_____
Fawn Rajbhandari-Korr
*Attorney for Plaintiffs*

## CERTIFICATION OF URGENCY DURING SHUTDOWN

The parties' counsel met and conferred on November 4, 2025, regarding the filing of Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction and Plaintiffs' Ex Parte Application for Class Certification.  Because Plaintiffs are seeking emergency relief that was not resolved by meeting and conferring, the motions must be urgently resolved by the Court.

By: _____
Lori Rifkin
*Attorneys for Plaintiff*

PLS' EX PARTE APP. FOR TEMP. RESTRAINING ORDER & OSC RE: PRELIM. INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES [Case No. 3:25-cv-09508-AMO]