BRETT A. SHUMATE
Assistant Attorney General
Civil Division
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division
TYLER BECKER
Counsel to the Assistant Attorney General
JOSEPH E. BORSON
Assistant Branch Director
JASON ALTABET
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0727
Email: Jason.K.Altabet2@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| PERRONE, *et al.,* | Case No. 4:25-cv-09508-AMO |
| Plaintiffs, | DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| ROLLINS, *et al.,* | Hearing Date: November 10, 2025 |
| Defendants. | Time: 2:00 pm |
| | Judge:  Hon. Araceli Martínez-Olguín |
| | Hearing by Videoconference |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.    The Food and Nutrition Act ................................................................................... 2

II.   SNAP appropriations ............................................................................................. 2

III.  Related litigation and events ................................................................................. 3

IV.   This litigation ........................................................................................................ 5

ARGUMENT ..................................................................................................................... 5

I.    PLAINTIFFS' CHALLENGE LACKS MERIT. ................................................. 6

      1.    SNAP benefit allotments are subject to appropriations. ........................... 6

      2.    Plaintiffs' arguments to the contrary are wrong ....................................... 7

            i.     Plaintiffs adopt an unduly narrow reading of Subsection 2013(a)(1) and
                   Section 2027 ................................................................................. 9

            ii.    Plaintiffs' reading of Subsection 2014(a) is unduly broad. ................ 11

            iii.   Plaintiffs' construction cannot be squared with other budgetary legislations ....... 11

            iv.    Plaintiffs' reliance on *Maine Cmty. Health Options v. United States* is
                   misplaced ..................................................................................... 13

II.   THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED
      RELIEF ................................................................................................................. 13

III.  ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND
      ACCOMPANY A BOND ..................................................................................... 14

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES**

*Almendarez–Torres v. United States,*
   523 U.S. 224 (1998)............................................................................................... 7

*Astrue v. Capato,*
   566 U.S. 541 (2012)............................................................................................... 9

*Bailey v. United States,*
   516 U.S. 137 (1995)............................................................................................. 12

*Carachuri-Rosendo v. Holder,*
   560 U.S. 563 (2010)............................................................................................... 9

*Dep't of Educ. v. California,*
   No. 24A910, 604 U.S. 650 (2025)....................................................................... 14

*Direct Mktg. Ass'n v. Brohl,*
   575 U.S. 1 (2015)................................................................................................... 7

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000)............................................................................................. 12

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015)............................................................................... 14

*Hall v. United States Dep't of Agric.,*
   984 F.3d 825 (9th Cir. 2020)............................................................................... 12

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010)................................................................................................... 9

*Maine Cmty. Health Options v. United States,*
   590 U.S. 296 (2020)............................................................................................. 13

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009)............................................................................... 14

*Munaf v. Geren,*
   553 U.S. 674 (2008)........................................................................................... 5, 6

*NIH v. Am. Pub. Health Ass'n,*
   606 U.S. __,145 S. Ct. 2658 (2025) (Mem.)...................................................... 15

*Nken v. Holder,*
   556 U.S. 418 (2009)............................................................................................... 6

*Panama R. Co. v. Johnson*,
   264 U.S. 375 (1924)...................................................................................... 9

*Ratzlaf v. United States*,
   510 U.S. 135, (1994)...................................................................................... 10

*Whitman v. Am. Trucking Associations*,
   531 U.S. 457 (2001)....................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................... 6, 13

*Yates v. United States*,
   574 U.S. 528 (2015)....................................................................................... 11

*Yellen v. Confederated Tribes of Chehalis Reservation*,
   594 U.S. 338 (2021)........................................................................................ 9

**STATUTES**

2 U.S.C. § 622.............................................................................................11, 12

2 U.S.C. § 900.............................................................................................11, 12

5 U.S.C. § 706.................................................................................................... 6

7 U.S.C. § 2012.................................................................................................. 2

7 U.S.C. § 2013...........................................................................................*passim*

7 U.S.C. § 2014...........................................................................................*passim*

7 U.S.C. § 2020............................................................................................... 2, 8

7 U.S.C. § 2027...........................................................................................*passim*

31 U.S.C. § 1512................................................................................................ 3

Food, Agriculture, Conservation, & Trade Act of 1990,
   Pub. L. No. 101-624, 104 Stat. 3359 .......................................................... 10

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................................. 7

Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-42, 138 Stat. 25................................................................ 2, 3, 7

Full-Year Continuing Appropriations and Extensions Act, 2025,
   Pub. L. No. 119-4, 139 Stat. 9 ................................................................... 2, 3, 7

**RULES**

Fed. R. Civ. P. 65 ..................................................................................................... 14

**REGULATIONS**

7 C.F.R. § 280.1 ........................................................................................................ 3

**OTHER AUTHORITIES**

H.R. Rep. No. 99-271, *reprinted in* 1985 U.S.C.C.A.N. 1103 ........................................... 10

Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and
    Execution of the Budget, Fiscal Year 2026 (2024) ............................................................. 3

USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense
    Update for November 2025 (Oct. 10, 2025),
    https://perma.cc/LDG4- DQMC ....................................................................................... 3

USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense
    Update for November 2025 (Oct. 24, 2025),
    https://perma.cc/4VPF-4ANN ....................................................................................... 3, 4

# INTRODUCTION

The Supplemental Nutrition Assistance Program ("SNAP") is a critical program that, through regular allotments and extraordinary disaster disbursements ("D-SNAP"), helps improve food security for millions of Americans. At its regular level, SNAP requires approximately $8.5 to 9 billion dollars each month in appropriated funds to operate. Unfortunately, the ongoing lapse in appropriations has left SNAP with no appropriated funds in its annual allotments account. As a consequence of this never-before-seen-circumstance and amid various court orders, the U.S. Department of Agriculture ("USDA") has had to issue various guidance to State agencies on how to handle November benefits.

Pursuant to the Food and Nutrition Act of 2008 ("FNA"), SNAP allotment benefits are "[s]ubject to the availability of funds appropriated." *See* 7 U.S.C. § 2013(a); *see also id.* § 2027(a)(1) (providing for the "[a]uthorization of allotments" through appropriations). Indeed, the FNA goes further to mandate that USDA reduce or suspend allotments, as needed, to match the amount appropriated. *Id.* § 2027(b). In short, Congress made explicit—multiple times over—that SNAP allotments are subject to, and limited by, Congressional appropriations. Pursuant to this statutory limitation, Congress has, for decades, appropriated billions of dollars every year to fund SNAP and its allotments.

According to Plaintiffs, however, no specific Congressional appropriation is—or has ever been—required. Rather, Plaintiffs claim that SNAP is a mandatory payment program that must be paid regardless of Congressional appropriations. There is no support for this claim in the statutory text, structure, or decades of appropriations practice.

Plaintiffs' case rises and falls on a single sentence at the end of Subsection 2014(a) of the FNA, which states that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." *Id.* § 2014(a). According to Plaintiffs, Subsection 2014(a)'s use of the word "shall" converts SNAP into a mandatory payment program that must be funded regardless of any Congressional appropriation. Not only does this reading render decades of Congressional appropriations irrelevant, but it runs contrary to the plain text and structure of the statute. This Court should reject Plaintiffs' statutory claim on the merits and hold what Congress has long recognized: SNAP requires specific appropriations.

1    Beyond the merits, balance of the equities and irreparable harm also favor Defendants.

2                                                    **BACKGROUND**

3    **I.        The Food and Nutrition Act**

4    Under the FNA, SNAP serves as a critical federal nutrition assistance program administered by

5    USDA at the federal level and implemented by state SNAP agencies at the local level. *See* 7 U.S.C. § 2020.

6    Under the FNA, SNAP benefits "shall be furnished to all eligible households" that apply for SNAP, *id.*

7    § 2014(a)—but, crucially, "subject to the availability of funds appropriated under section 2027 of this

8    title," *id.* § 2013(a). Subsection 2027(a), in turn, authorizes appropriations for SNAP "allotments." *See id.*

9    § 2027(a)(1) (providing for the "[a]uthorization of allotments" through appropriations "[t]o carry out this

10   chapter"); *see also id.* § 2012(b) (defining "allotments" as "the total value of benefits a household is

11   authorized to receive during each month").

12   Moreover, recognizing that SNAP may suffer from insufficient appropriations, Congress set forth

13   procedures and guidelines governing such an event. It directed that "[i]n any fiscal year, the Secretary

14   shall limit the value of those allotments issued to an amount *not in excess of the appropriation for such*

15   *fiscal year.*" *See id.* § 2027(b) (emphasis added). In the event of a potential shortfall of the appropriated

16   funds, the Secretary may issue a reduction, and "[n]otwithstanding any other provision of this chapter,"

17   Congress requires that "the Secretary shall direct State agencies to reduce the value of such allotments to

18   be issued to households certified as eligible to participate in the supplemental nutrition assistance program

19   to the extent necessary to comply with the provisions of this subsection." *Id.*

20   **II.       SNAP appropriations**

21   Congress appropriates federal funds for SNAP benefits during the annual appropriations process.

22   *See id.* § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the

23   Secretary is authorized to formulate and administer [SNAP].").  In the last regular appropriations bill,

24   Congress fully funded the program through the end of the 2024 Fiscal Year ("FY"). *See* Consolidated

25   Appropriations Act, 2024, Pub. L. No. 118-42, Div. B, Title IV, 138 Stat. 25, 93 (Mar. 9, 2024). Congress

26   continued the program through the end of FY 2025 through a full-year continuing appropriations act. *See*

27   Full Year Continuing Appropriations and Extensions Act, 2025, Div. A, Title I, Sec. 1101(a) and 1109(a),

28

139 Stat. 9, 10, 13 (Mar. 15, 2025). As of November 7, 2025, there is no SNAP account covering FY 2026 benefits and administrative costs as Congress has not provided an appropriation to fund the account.

Congress has also provided, through a multi-year fund, emergency reserves for SNAP funding. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). Each bill includes funds to "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Consolidated Appropriations Act, 2024, 138 Stat. at 93. Generally, those funds are used in the event of a disaster, such as a hurricane, to provide critical relief. 7 C.F.R. § 280.1.

After SNAP funds are appropriated by Congress, the Office of Management and Budget ("OMB") "apportions" them for USDA's administration of SNAP. *See* 31 U.S.C. § 1512; Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and Execution of the Budget, Fiscal Year 2026 § 10.5 (2024) ("OMB Circular A-11") (July 2024) § 10.5. The apportionment provides USDA the necessary authority to obligate and expend funds for SNAP.

### III.    Related litigation and events

On September 30, 2025, the FY 2025 appropriation for the SNAP account lapsed. As the lapse in appropriation continued unabated, USDA informed States that SNAP benefits were at risk. On October 10, USDA explained that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 10, 2025), https://perma.cc/LDG4- DQMC. ("Oct. 10 Letter"). Because of these difficulties, USDA "direct[ed] States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id.*

Two weeks later, as the lapse in appropriations dragged on, USDA sent a second letter. At that time, USDA formally "suspend[ed] all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise." USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025

(Oct. 24, 2025), https://perma.cc/4VPF-4ANN. ("Oct. 24 Letter").

On October 28, 2025, a coalition of States filed suit in the District of Massachusetts. *Commonwealth of Massachusetts et. al., v. Rollins et. al*., 1:25-cv-13165 (D. Mass.). Two days later, a group of organizations and municipalities filed their own suit. *See RISCC*, 1:25-cv-569 (D. R.I.).[1] On October 31, the *Commonwealth of Massachusetts* Court ordered USDA to consider "whether t[o] authorize at least reduced SNAP benefits for November and, if so, their timeline for determining whether to authorize only reduced SNAP benefits using the Contingency Funds or to authorize full SNAP benefits using both the Contingency Funds and additional available fund." *Commonwealth of Massachusetts*, ECF No. 26 at 15. The court otherwise kept the motion for a temporary restraining order pending. At the same time, the *RISCC* Court ordered Defendants to deplete the entire SNAP contingency fund and consider using any other available funds. *See RISCC*, ECF No. 19. Restricted by the orders, USDA subsequently determined that it would make partial allotments. Both courts understood that, to make full payments, USDA would be forced to take funds from other programs—specifically the Child Nutrition Programs.

On November 3, Defendants filed a status report and declaration laying out USDA's compliance and reasoning. *See, e.g., Commonwealth of Massachusetts*, ECF No. 48. USDA explained, in its declaration, why it had declined to transfer billions of dollars from other food security programs. *Id*. ECF No. 48-1. USDA then filed an initial memorandum and tables implementing use of the contingency fund in a reduction. *Id*. ECF No. 55. And, after further calculations, on November 5, USDA was able to increase available benefits—reducing the maximum allotment by 35% rather than 50%—and updated its memorandum and tables to reflect that recalculation. *Id*. ECF No. 65.

On November 6, the *RISCC* Court ordered USDA to provide full benefits to States by Friday, November 7, through a multi-billion-dollar depletion of the Child Nutrition Programs funds. *RISCC*, ECF No. 34. Defendants sought an emergency stay pending appeal and an administrative stay from the First Circuit. The First Circuit denied the administrative stay and has yet to rule on Defendants' motion for a stay pending appeal. *See RISCC v. Rollins*, 25-2089, Order Denying Administrative Stay (1st Cir. Nov. 7, 2015). Defendants subsequently sought a stay and an administrative stay from the Supreme Court. Justice

---

[1] Neither of the other two lawsuits rely on the statutory claim Plaintiffs raise here.

1  Jackson granted an administrative stay on November 7, which will last until forty-eight hours after the

2  First Circuit rules on Defendants' motion for a stay pending appeal. *See* Stay Order, *Rollins v. RISCC*,

3  25A539 (Nov. 7, 2025).[2]

4      **IV.**   **This litigation**

5        Plaintiffs are three California residents who are certified by the State to receive SNAP benefits.

6  They initiated this action on November 4, 2025, bringing claims against USDA Secretary, Brooke Rollins,

7  and OMB Director, Russell Vought, on behalf of themselves individually and a putative class of "42

8  million recipients of federal food benefits who are harmed by Defendants' failure to provide full [SNAP]

9  benefits absent a Congressional appropriation." Compl. ¶ 2, ECF No. 1. Plaintiffs claim that the FNA

10  "requires Defendants to (1) confirm that federal funds are obligated, and (2) direct the states to issue full

11  SNAP benefits for November 2025 and all subsequent months, regardless of whether Congress has passed

12  an appropriations act or continuing resolution." *Id.* ¶ 9. Plaintiffs request that the Court issue "a temporary

13  restraining order and then preliminarily and permanently enjoin Defendants from interfering with

14  Plaintiffs' entitlement to timely receive and redeem SNAP benefits." *Id.* p.15. They seek declaratory relief

15  that Defendants have violated the FNA and the Administrative Procedure Act ("APA") and seek a writ of

16  mandamus compelling the OMB Director "to apportion the necessary funds to fulfill USDA's SNAP

17  obligations for November 2025 and all subsequent months in the absence of an appropriation act or

18  continuing resolution, and directing [USDA Secretary] to instruct state SNAP agencies to issue such

19  benefits." *Id.* p.16.

20        On November 5, 2025, Plaintiffs filed an *ex parte* motion for a temporary restraining order

21  ("TRO"), *see* Pls.' Ex Parte Motion for TRO, ECF No. 11, and an application for provisional class

22  certification, *see* Pls.' Ex Parte App. for Provisional Class Cert., ECF No. 9.[3] On November 6, 2025, this

23  Court scheduled a hearing on the TRO for 2:00 PM on November 10, 2025. *See* ECF No. 15.

24                                          **ARGUMENT**

25

26      [2] Given Justice Jackson's recent stay and its real-time implications for the Government's obligation regarding SNAP allotments, Defendants reserve the right to amend representations made this filing with a subsequent filing prior to the hearing.

27      [3] Because this Court's scheduling order only addressed the TRO, *see* ECF No. 15, Defendants will respond to the application for class certification in the ordinary course.

28

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs cannot satisfy these requirements.

## I.    PLAINTIFFS' CHALLENGE LACKS MERIT.

Plaintiffs argue that Section 2014 of the FNA establishes SNAP as a mandatory payment program without regard to specific Congressional appropriations by providing that "[a]ssistance under this program *shall* be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a) (emphasis added). Plaintiffs contend that the use of the word "shall" amounts to an obligation-creating language that compels Defendants to provide uninterrupted SNAP benefits regardless of appropriation. Defendants' failure to provide such benefits, Plaintiffs maintain, is "contrary to law" in violation of the APA. *See* TRO at 13-20; *see* 5 U.S.C. § 706(2) (providing that the court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are "in excess of statutory jurisdiction [or] authority"). Plaintiffs' argument fails.

### 1.    SNAP benefit allotments are subject to appropriations.

The FNA, which authorizes the current version of SNAP, makes clear that SNAP benefits—i.e. "allotments"—are subject to Congressional appropriations. At the outset, Section 2013 of the Act, entitled "[e]stablishment of supplemental nutrition assistance program," provides that "[s]ubject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer a supplemental nutrition assistance program . . . ." 7 U.S.C. § 2013(a)(1). Subsection 2027(a), in turn, provides for the "[a]uthorization of allotments" through Congressional appropriation but does not

itself appropriate those moneys. *See id.* § 2027(a)(1) (entitled in part "[a]uthorization of allotments," and provides that "[t]o carry out this chapter, there are authorized to be appropriated such sums as are necessary for each of fiscal years 2008 through 2023"); *see also Almendarez–Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)). Subsection 2027(b) ties the amount of allotments to appropriations by explicitly providing that "allotments" cannot "exce[ed] . . . the appropriation *for such fiscal year*." *See id.* § 2027(b) (emphasis added). Indeed, Subsection 2027(b) goes further to make clear that "[n]otwithstanding any other provision of this chapter," if allotments in any fiscal year would exceed the appropriations, the Secretary must reduce the value of the allotments to match the appropriations. *See id.*; *see also id.* § 2027(c) ("prescribing the manner in which allotments will be reduced under [Subsection 2027(b)]).

Pursuant to the plain text of the relevant provisions, for decades, Congress has funded SNAP allotments through yearly appropriations or continuing resolutions. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4488 (2022) (appropriating $153,863,723,000 "[f]or necessary expenses to carry out the Food and Nutrition Act of 2008"). Additionally, Congress has provided, through a multi-year fund, emergency reserves for SNAP funding "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). Congress' repeated appropriations of funds for SNAP benefits—and a contingency fund for emergency uses—further bolsters the conclusion that the FNA's subject-to-appropriations qualifier means what it says: benefits are subject to appropriations. Any other reading would not only directly contradict Subsection 2013(a)(1) and Section 2027 of the FNA, but would also render decades worth of Congressional appropriations superfluous. *See Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015) (explaining that courts must "try to avoid" interpretations that lead to "mere surplusage").

### 2. Plaintiffs' arguments to the contrary are wrong.

According to Plaintiffs, however, Congress' decades-long practice of appropriating funds for

SNAP allotments was not only needless, but also erroneous. As Plaintiffs see it, SNAP was established as a mandatory payment program. As such, Plaintiffs maintains, SNAP allotments must be paid regardless of any Congressional appropriation or continuing resolution. Plaintiffs' argument is belied by the plain text and structure of the statute and should be rejected.

Plaintiffs' argument relies mainly on the final sentence in Subsection 2014(a), which states that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a)(1). Latching onto the word "shall," Plaintiffs argue that this sentence obligates the government to provide uninterrupted SNAP allotments to eligible household regardless of whether any funds for SNAP allotments have been appropriated.

In an attempt to bolster this argument, Plaintiffs cite to other provisions in the statute, which they argue use "mandatory language to ensure uniform and reliable provision of SNAP benefits." TRO at 16 (citing, among others, Subsection 2020(e)(3), which provides for "an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application," 7 U.S.C. § 2020(e)(3), and Subsection 2020(b), which establishes that "State agency shall properly restore any improperly denied benefits . . . and shall take other steps to prevent a recurrence of such errors," *id.* § 2020(b)).

While Plaintiffs acknowledge Subsection 2013(a)(1)'s subject-to-appropriations qualifier, they argue that the provision does not pertain to SNAP allotments. According to Plaintiffs, Subsection 2013(a)(1) "impose[s] fiscal limits on program administration, not individual benefits." TRO at 19. As Plaintiffs see it, "[t]he only way to give each section full operative effect is to read section 2013 as requiring appropriations for program development and administration *only*," and read Section 2014 as well as the other cited sections as "create[ing] a legal duty for USDA to ensure regular issuance of SNAP benefits to qualifying households." *Id.* As for Section 2027, Plaintiffs concede that it "provides for a benefit reduction when the total value of benefit allotments will exceed the appropriation for the fiscal year," but maintain that it does not "allow USDA to shut SNAP down altogether when Congress fails to pass an appropriation." *Id.* at 20.

Plaintiffs' interpretation of the FNA does not withstand scrutiny for the below reasons.

1                 *i.*      *Plaintiffs adopt an unduly narrow reading of Subsection 2013(a)(1) and*

2                           *Section 2027.*

3      Contrary to Plaintiffs' assertion, Subsection 2013(a)(1)'s subject-to-appropriations qualifier is not

4 limited to the administrative costs; it also captures SNAP allotments. Subsection 2013(a)(1) provides for

5 SNAP "[s]ubject to the availability of funds appropriated *under section 2027* of this title." 7 U.S.C.

6 § 2013(a)(1) (emphasis added). For its part, Section 2027, entitled "[a]ppropriations and allotments"

7 begins by declaring that "[t]o carry out *this chapter*, there are authorized to be appropriated such sums as

8 are necessary for each fiscal years . . . ." *Id.* § 2027(a)(1) (emphasis added). As this provision makes clear,

9 appropriations are required to carry out the chapter in its entirety—including allotments. Indeed, the

10 caption for Subsection 2027(a) begins with the phrase "[a]uthorization *of allotments.*" *Id.* (emphasis

11 added). And Subsection 2027(b) explicitly ties "allotments" to available appropriations by providing that

12 "[i]n any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in

13 excess of the appropriation for such fiscal year." *Id.* § 2027(b). Indeed, by its own terms, Section 2027(b)'s

14 mandate that allotments match appropriations trumps all other provisions in the FNA: "*[n]otwithstanding*

15 *any other provision of this chapter*, if in any fiscal year the Secretary finds that the requirements of

16 participating States will exceed the appropriation, the Secretary shall direct State agencies to reduce the

17 value of such allotments to [match appropriations]." *Id.* (emphasis added).

18      By cross referencing Section 2027 (which explicitly ties allotments to appropriations), Subsection

19 2013(a)(1) makes clear that its subject-to-appropriations qualifier captures SNAP allotments. After all, it

20 is black-letter law that "incorporating one [provision] into another . . . serves to bring into the latter all

21 that is fairly covered by the reference." *Panama R. Co. v. Johnson*, 264 U.S. 375, 392 (1924); *see also*

22 *Yellen v. Confederated Tribes of Chehalis Reservation*, 594 U.S. 338, 344–348 (2021); *Astrue v. Capato*,

23 566 U.S. 541, 547–549 (2012); *Carachuri-Rosendo v. Holder*, 560 U.S. 563, 566–570 (2010); *Holder v.*

24 *Humanitarian Law Project*, 561 U.S. 1, 8–9 (2010).

25      Moreover, Plaintiffs' attempt to limit the scope of Section 2027 is futile. While Plaintiffs argue

26 that the FNA does not expressly authorize USDA to suspend SNAP benefits altogether, they concede that

27 Subsection 2027(b) "provides for a benefit reduction when the total value of benefit allotments will exceed

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 4:25-CV-09508-AMO

the appropriation for the fiscal year." TRO at 20. This concession alone dooms their statutory theory altogether. By acknowledging that Section 2027 requires allotment benefits to match Congressional appropriations, Plaintiffs admit that the FNA ties SNAP allotments to appropriations. This concession is impossible to square with Plaintiffs' overarching statutory theory that SNAP allotments are mandatory payments—i.e., not tied to annual appropriations.

Plaintiffs gloss over this fatal flaw in their argument by pivoting to the legislative history of Section 2027. According to Plaintiffs, the Court should ignore the plain text of Section 2027 in favor of a House Report, which they claim "demonstrates that Congress implemented section 2027 to prevent the sudden interruption of SNAP benefits when appropriated funds ran out." TRO at 20 (citing portions of the House Report referencing the "'uncertain[ty] … [and] threat[s] [of] delays and reductions pending Congressional approval of supplemental appropriations legislation late in the fiscal year'" (quoting H.R. Rep. No. 99-271, 166, *reprinted in* 1985 U.S.C.C.A.N. 1103, 1266)).

At the outset, this Court should reject Plaintiffs' attempt to use "legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48, (1994). But even assuming that the legislative history is relevant, the record does not help Plaintiffs for three reasons. *First*, the quoted language itself acknowledges that funds for SNAP benefits must be appropriated by Congress. *See* H.R. Rep. No. 99-271 (acknowledging the need for "supplemental appropriations" to meet program demands). *Second*, the portion of the Report cited by Plaintiffs pertains to language in the statute that has since been struck by Congress. *See* Food, Agriculture, Conservation, & Trade Act of 1990, Pub. L. No. 101-624, § 1760, 104 Stat. 3359, 3804 (striking the phrase "amount authorized in subsection (a)(1)" of this section and restoring the language back to requiring partial benefits when the *appropriation* itself is exceeded). The language cited by Plaintiffs therefore holds no bearing on the current statute. *Third*, Plaintiffs' citation remarkably omits the most important portion of the Report, which explicitly states that "[o]f course, the Secretary would be expected to suspend program operations at any point when appropriations for the program have been depleted." *See* H.R. Rep. No. 99-271, at 167. In doing so, the Report makes clear that without appropriations, SNAP must be suspended; there is no continued, mandatory outlay in the absence of appropriations for the program itself.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 4:25-CV-09508-AMO

ii.    *Plaintiffs' reading of Subsection 2014(a) is unduly broad.*

Contrary to Plaintiffs' contention, the final sentence in 7 U.S.C. § 2014(a)—which provides that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation"—is not a standalone provision. Subsection 2014(a), like all other provisions within the FNA, must be read in light of the FNA's overall statutory scheme. Section 2013 "[e]stablish[es]" SNAP, *id.* § 2013, and precedes all substantive provisions regarding the requirements and implementation of the program. In doing so, Section 2013 cabins all provisions that follow it—including Subsection 2014(a). *See Yates v. United States*, 574 U.S. 528, 54-41 (2015) (plurality) (interpreting the relevant provision in light of its placement within the statute). Read in this light, it becomes clear that Subsection 2014(a) assumes that SNAP funding has, indeed, been appropriated. After all, without appropriations, SNAP itself must be suspended. *See* 7 U.S.C. § 2027(b) ("*Notwithstanding any other provision of this chapter*, if in any fiscal year the Secretary finds that the requirements of participating States will exceed the appropriation, the Secretary shall direct State agencies to reduce the value of such allotments to [match appropriations]." (emphasis added)).

Plaintiffs' reading of the final sentence in Subsection 2014(a) is entirely detached from the statutory context. As Plaintiffs see it, this sentence—plopped at the bottom of a paragraph dedicated to SNAP eligibility—establishes SNAP as a mandatory payment program. Not only is Plaintiffs' reading conveniently selective, but it also relies on the dubious assumption that Congress created a multi-billion-dollar mandatory payment program in passing. As the Supreme Court has cautioned, courts should not assume that Congress "hide[s] elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

iii.    *Plaintiffs' construction cannot be squared with other budgetary legislations.*

Despite Plaintiffs' contention to the contrary, 2 U.S.C. § 622(9) and 2 U.S.C. § 900(c)(8), two budgetary acts that reference SNAP, do not support the conclusion that SNAP is a mandatory payment program. Indeed, they further confirm that SNAP benefits are dependent on recurring appropriations.

The first provision, 2 U.S.C. § 622(9), provides:

> (9) The term "entitlement authority" means—
>     (A) the authority to make payments . . . , the budget authority for which is not

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
CASE NO. 4:25-CV-09508-AMO

1

2

> provided for in advance by appropriation Acts, . . . if, under the provisions of the law containing that authority, the United States is obligated to make such payments to persons or governments who meet the requirements established by that law; and
> (B) the food stamp program.

3   By independently identifying the "food stamp program" in subsection (B), the provision makes

4   clear that SNAP does not fall within subsection (A), which encompasses programs for which "budget

5   authority . . . is not provided for in advance by appropriation Acts." Any other reading would render

6   subsection (B) superfluous. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that

7   Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").

8   The second provision, 2 U.S.C. § 900(c)(8), defines the phrase "direct spending" in three separate

9   ways: "(A) budget authority provided by law other than appropriation Acts; (B) entitlement authority; and

10  (C) the Supplemental Nutrition Assistance Program." Similar to 2 U.S.C. § 622(9), this provision also

11  separately identifies "budget authority provided by law other than appropriation Acts" in Subsection (A)

12  and SNAP in Subsection (C). In doing so, it also makes clear that SNAP is not the type of program for

13  which "budget authority [is] provided by law other than appropriation Acts." Otherwise, the SNAP-

14  specific qualifier would be unnecessary.

15  In short, both provisions, by distinguishing between SNAP and mandatory payment programs,

16  bolster the Government's reading of the FNA. *See Hall v. United States Dep't of Agric.*, 984 F.3d 825, 838

17  (9th Cir. 2020) (explaining that "'[t]he meaning of one statute may be affected by other Acts'" (quoting

18  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

19  For their part, Plaintiffs posit that these provisions support their conclusion that SNAP is a

20  mandatory spending program. *See* TRO at 17-18. As Plaintiffs see it, by including SNAP within the

21  definition of "entitlement authority" in 2 U.S.C. § 622(9), and also within the definition of "direct

22  spending" in 2 U.S.C. § 900(c)(8), Congress made clear that SNAP is a mandatory payment program.

23  This argument suffers from a fundamental flaw: it assumes that *all* forms of "entitlement authority" and

24  "direct spending" are mandatory payment programs that are not subject to specific appropriations.

25  Plaintiffs have failed to identify any support for this proposition, which, in any event, is contradicted by

26  the structure of these two budgetary provisions that expressly separate SNAP from programs that are, in

27  fact, not subject to annual appropriations.

28

1
2

     iv.  *Plaintiffs' reliance on* Maine Cmty. Health Options v. United States *is misplaced.*

3    Lastly, Plaintiffs' attempt to analogize this case to *Maine Cmty. Health Options v. United States*,

4 590 U.S. 296 (2020), is futile. In *Maine Cmty. Health Options*, the Court concluded that the Risk Corridors

5 Provision in the Affordable Care Act—which provided in part that "[i]f an insurance plan loses a certain

6 amount of money, the Federal Government 'shall pay' the plan"—created an obligation on the

7 Government to pay even if Congress has failed to appropriate funds for such payments. *Id.* at 300, 314.

8 But as the Court emphasized there, the Risk Corridors Provision did not include a "subject to the

9 availability of appropriations" provision. *Id.* at 313. Here, by contrast, the FNA includes an explicit

10 subject-to-appropriations provision. *See* 7 U.S.C. § 2013(a)(1). Indeed, in *Maine Cmty. Health Options*,

11 the Court explicitly contrasted the Risk Corridors Provision with, among others, *the very provision at*

12 *issue here*, Subsection 2013(a)(1) of the FNA, and explained that the latter "restricted 'shall pay' language

13 to an appropriation or available funds." 590 U.S. at 313 n.7.

14    Because Plaintiffs have failed to show that the FNA's subject-to-appropriation qualifier does not

15 apply to SNAP allotments, their statutory challenge under the APA fails on the merits. SNAP is, and has

16 always been, an appropriations-dependent program.

17 **II.  THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.**

18    The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief

19 to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

20 Plaintiffs argue that they will suffer irreparable harm due to a "delay or reduction in SNAP benefits." TRO

21 at 21. But, as explained above, earlier this week, USDA issued guidance and reduced maximum allotment

22 tables to allow States to fund partial November SNAP allotments. *See supra* Background III.

23    The balance of the equities also weighs against injunctive relief. Plaintiffs face an even higher-

24 than-usual bar for obtaining injunctive relief here. That is because Plaintiffs do not seek to preserve the

25 status quo but instead ask the Court to take the exceptionally extraordinary step of entering mandatory

26 injunctions against the USDA Secretary and OMB Director. As to the USDA Secretary, Plaintiffs ask the

27 Court to order her to "continue SNAP operations by instructing state SNAP agencies to submit full benefit

28

issuance files to EBT vendors as usual in the month of November 2025 for the disbursement of November 2025 SNAP benefits, and each month thereafter." *See* ECF No. 11-1, Proposed Order at 2. And as to OMB Director, Plaintiffs ask for an order compelling the Defendant to "fully fund November 2025 benefits, and each month thereafter." *Id*.

These requested injunctions are mandatory, not prohibitory. As the Ninth Circuit has explained, "[p]rohibitory injunction[s]" simply "preserve the status quo pending a determination of the action on the merits," while "mandatory injunction[s]" "order[] a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (internal quotation omitted). Mandatory injunctions are "particularly disfavored," and courts do not issue them in "doubtful cases." *Id.* at 879. A district court may enter a mandatory injunction only upon a finding that "the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The facts and law here do not clearly favor Plaintiffs.

And while mandatory injunctions are disfavored in any case, the mandatory injunctions Plaintiffs request here are particularly disfavored: Plaintiffs seek relief that exceeds the Court's power to grant and raises grave separation of powers concerns. The Court should reject Plaintiffs' request outright to subvert Congress' authority to appropriate funds by converting an appropriations-based program into a mandatory payment program.

Because Plaintiffs fail to carry their burden of showing immediate irreparable harm, they cannot meet the requirements for obtaining immediate injunctive relief. The Court should deny the TRO motion on this basis alone.

## III.   ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, No. 24A910, 604 U.S. 650, 652 (2025).

To the extent the Court issues injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum,

administratively stayed for a period of forty-eight hours to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. That is especially true because any distributed moneys may be forever lost. *See NIH v. Am. Pub. Health Ass'n*, 606 U.S. __,145 S. Ct. 2658 (2025) (Mem.) (finding the government irreparably harmed where plaintiffs failed to commit to "repay[ing] grant money if the Government ultimately prevails").

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motions for a Temporary Restraining Order.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

TYLER BECKER
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Jason K. Altabet*
JASON K. ALTABET
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0727
Email: Jason.K.Altabet2@usdoj.gov

*Attorneys for Defendants*